## No. 5620.

25  723
29  326

## A. S. BRADFORD v. THE STATE.

1. PRACTICE—CHARGE OF THE COURT should be limited to the case made by the indictment and the proof; but, unless specially excepted to, a conviction is not necessarily reversible because the charge transcends this rule.

2. SAME.—Upon a trial for aggravated assault, the court charged the jury as follows: "The jury are instructed to have due regard to a broken and violated law, and the probability of inflicting an unjust punishment upon an innocent party." *Held* error, because, in assuming that the law had been broken and violated, it was calculated to injure the rights of the appellant.

3. SAME.—The court further instructed the jury as follows: "Before you can find the defendant guilty as charged in the information, you must believe beyond a reasonable doubt that the acts done by the defendant at the time of the commission of the assault were acts of preparation on the part of the defendant to have illicit, unlawful and improper connection; that is, that unlawful handling of the privates, or attempt to handle the privates, of the alleged injured party with the party assaulted." *Held* erroneous, because vague, indefinite and uncertain, if not utterly meaningless in the latter clause.

4. SAME.—The court gave the following special instruction: "An aggravated assault and battery may be committed by any indecent handling or fondling of the person of a female by an adult male, without her consent and against her will;" adding thereto as follows: "Submitted by the court, and the jury will please be governed thereby." *Held*, that the addenda was error, because not a "modification" of the special charge within the meaning of the statute, and because it was calculated to impress on the jury that, in the opinion of the court, such a case had been made out against the appellant.

APPEAL from the County Court of Stephens.    Tried below before the Hon. J. C. Shepard, County Judge.

The conviction in this case was for an aggravated assault and battery upon a school girl, the aggravation alleged being that the appellant was an adult male and the girl a female.    The penalty assessed by the verdict was a fine of fifty dollars and confinement in the county jail for thirty days.

The young lady named as the injured party was the first witness for the State.    She testified that she was about fourteen years old, and lived in the Caddo neighborhood, in Stephens

county, Texas.    The defendant taught the school in that neigh-
borhood in December, 1886, and the witness was one of the
scholars attending that school.    That school was kept in what
was known as the Riddle school house.    All, or nearly all, of the
pupils, took their dinners to school with them, witness among
the number.    When school was dismissed at noon on December
5, 1886, the witness and a number of girls repaired to a custom-
ary place outside of the school house.    After eating their dinner
the witness and some of the girls went to the creek, leaving
others of the girls behind.    The witness remained at the creek
but a minute, and, leaving her companions there, returned to
the school house to join the girls left behind.    When she got to
the school house door, the witness saw the defendant sitting
behind his desk in the west end of the room.    When he saw
witness he called her to him.    When witness reached his desk
he asked witness where the other girls were.    Witness replied
that they were coming from the creek.    The defendant then
reached over his desk, seized witness's clothing in the region of
the abdomen, and asked her to unbutton her drawers.    The wit-
ness plainly felt the pressure of his hand on her person.    She
released herself from his grasp, seized a piece of wood, and told
defendant that if he touched her again she would knock his head
off.

Cross examined, the witness said that the school room had
three windows on each side and two on one end, the door being
at the south end.    The house was situated in an open prairie
valley, and within twenty-five or thirty yards of a public road.
The creek, to which a path led, was about one hundred and fifty
yards from the school building.    The play grounds of the boys and
girls were separate, that of the girls being about fifty yards from
the school house and about thirty yards from the path which led
from the school house to the creek.    The girls whom the witness
expected to find at the school house on her return from the creek
on the said December 5, were not there when she got back.
Witness left the school room immediately after the insult
offered her by the defendant.    About the time she reached the
outside one of the girls called to her from the girl's play ground,
to bring the ball from the school room.    Witness returned to
the room, got the ball and took it to the play ground.    No
person, save the witness and defendant, was in the school room
at the time that defendant insulted the witness.

Another of the female scholars testified that she was attend-

ing the defendant's school at the time of this trouble, which oc-
curred on Tuesday, early in December, 1886.   The witness's first
intimation of any disagreeable occurrence was when the girl in
question reached the play ground from the school room.   Her
appearance indicated that something had aroused her anger.
Witness asked her what had occurred, but she made no reply.
The defendant often joined the pupils in their games at play
time, sometimes playing with the girls and sometimes with the
boys.   Among the games he taught the girls to play was one he
called "How the Indians whip their wives."   He often pulled
the hair of the girls, and on one occasion he proposed to "meas-
ure arms with the girls."   On another occasion he lay at length
on a bench and challenged the girls to keep him down.

Cross examined, the witness stated that, on the day of the al-
leged insult, she and some of the other girls ate their dinners
just outside of the school house.   After finishing dinner the
witness and nearly all of the girls went to the creek, leaving
not more than eight or ten girls at the school house.   The girl
in question remained at the creek but a short time, and then
went back toward the school house, traveling the usual path,
and meeting the other girls going toward the creek, about a
hundred yards from the school house.   The witness did not
know whether or not any of the school girls stayed at the school
house throughout the noon intermission.   On her return from
the creek the witness did not go direct to the school house, but
turned off to the girls' play ground, which was about thirty
yards distant from the path and about fifty yards from the
school house.   The girl in question went on to the school house.
It was thirty minutes from the time that the latter left the creek
until she rejoined the girls on the play ground.   Witness saw
no person about the school room while the said girl was there,
just before she came to the play ground.   When school was dis-
missed on that evening the defendant or some other person
asked the said girl why she was taking all of her books home.
She replied that she was going to quit school, and would attend
such a school no longer, and defendant told her to behave her-
self.   The defendant often joined the girls in their games, be-
ginning early in the session.   He first showed the girls "How
the Indians whip their wives" about the beginning of the ses-
sion, and showed them other games as the session advanced.
The girls, including witness, often invited the defendant to join
them in their games at play time.   Witness heard of no objec-

tion to the defendant playing with the girls until this trouble arose. When that trouble arose the school was closed, which was about a month and a half sooner than it was intended it should close. The said girl played with the other pupils at the evening recess after the alleged insult.

J. H. Rives testified, for the State, that he was the father of the prosecutrix, and the uncle of Miss Ophelia Richardson. The witness's said daughter attended the school taught by the defendant during the winter of 1886. The original contract under which the defendant taught the neighborhood school expired in November, 1886, but as a balance of school funds remained in the treasury to the credit of the school community, the defendant was employed to continue the school until that balance was exhausted, and he was teaching under that contract when this trouble occurred, which was on December 5, 1886. Returning home from school on the evening of the said December 5, the witness's daughter passed the witness where he was repairing a gate, and went into the house without speaking to the witness. She brought her books home with her and quit school. On his way to Ranger the next morning, the witness met the defendant, who was on his way to the school house. Witness told defendant that he had something to say to him, and invited him to walk a short distance with him. After walking about thirty steps, they stopped, and witness told defendant that he, witness, did not like the way he, defendant, was conducting the school. Defendant replied that he was glad the witness had come to him; that, when people disapproved of his manner of conducting his school, he wanted them to come to him about it; that he knew he had been conducting the school somewhat loosely, but that if he whipped pupils, some of his patrons objected, and that if he did not whip them, others objected that his discipline was too loose. The witness replied that he was not alluding to his general discipline, but that his daughter brought him some news on the evening before which he did not like, and that he did not approve of the defendant's attempt to meddle with his daughter, and that school must stop at once. Defendant replied that the girl was mistaken, and misunderstood him, and appealed to witness, who was one of the trustees of the school, to permit him to continue the school. Witness declined, and told defendant that the school must close that very day. Defendant then said that he was very sorry; that he was willing to kneel down there and then and pray with witness,

and again appealed to witness to permit him to continue his school.   Witness refused to be prayed with by defendant, and again told defendant that he must close the school that day; that, if he did not close it, it would be closed for him, and that, unless it was closed, there would be trouble, and bad trouble. Witness then went on to Ranger, and defendant went on towards the school house.   The school closed on that day.

Thomas Norris testified, for the State, that in December, 1886, he was a trustee of a school community in the northeastern part of Stephens county.   During the said month of December the defendant came into that community and applied for that school. He gave, as the reason for the closing of the school recently taught by him at the Riddle school house in the Caddo neighborhood, that some of his patrons were unable to clothe their children properly for the extreme cold weather, and the trustees thought it best, on that account, to discontinue the school.

J. D. Young testified as did Norris, and, in addition, that another reason given by defendant for the closing of the Caddo school was that the balance of the school fund to the credit of the Caddo community was too small to justify a further continuance of that school.

G. W. Gill, testifying for the State, denied that he ever told the defendant that the Caddo school had better be closed on account of the thinly clad condition of some of the children. The witness was a trustee of the Caddo school, but did not know why the school was closed.   Something was said about the thin clothing of some of the children, when the defendant was reemployed to teach out the unexpended balance of the community's school fund.

Trustee H. E. Walker testified substantially as did Mr. Gill.

The mother of the alleged injured girl testified, for the State, that when the latter got home from school on the evening of December 5, 1886, she appeared to be much troubled and mortified.   She was very fond of school and was a hard student.

The State closed.

James Bradford, the nephew of the defendant, was his first witness.   He testified that he attended the defendant's school in December, 1886, and was at school on the fifth day of that month, when this offense was alleged to have been committed.   The witness was unwell on that day, and spent the entire noon or dinner hour in the school room.   The defendant was not in the school room during that hour from the time that school was dis-

missed for dinner until it was taken up again. He spent that hour on the boys' play ground. All of the school girls went to the creek after eating dinner, and none of them came back to the school room until "books" was called. The girl in question played and romped with the other girls on the play ground at the evening recess of that day.

Orville Bradford, another nephew and pupil of the defendant, testified, in his behalf, that the defendant spent the entire noon hour of the said day playing base ball with the boys on their play ground, and was not in the school room during that hour.

Dick Richardson was the next witness for the defense. He stated that he had a conversation with his uncle, J. H. Rives, a few days after the Caddo school closed, about the closing of the school. Mr. Rives told him that he broke up the school because of the conduct of the defendant towards his daughter, and told him of his conversation with the defendant on the road substantially as he related it on the stand.

The defense here introduced the following:

### CERTIFICATE.

BRECKINRIDGE, TEXAS, Jan'y 26, 1887.

Whereas, the report is now prevailing that Professor A. S. Bradford, during a term of school taught by him in my community, made improper advances to my daughter. I hereby certify that I have examined into the report and pronounce it untrue.

(Signed)                                        J. H. RIVES.

To this certificate appears that of the county judge of Stephens county, certifying that J. H. Rives acknowledged the execution of the said document before him. In connection with this certificate, the defense read in evidence a letter to the defendant from and signed by B. B. Greenwood, county attorney of Stephens county, enclosing the said certificate, and asking the defendant if the certificate was sufficient and satisfactory.

The defense closing, the State recalled J. H. Rives to explain the certificate signed by him and introduced in evidence by the defense. He stated that he did not sign that certificate to exonerate the defendant from the charge of assault upon his daughter. The witness was told that the report was being circulated throughout the neighborhood that the defendant prevailed upon his daughter to unbutton her drawers for him, and that he, de-

fendant, then fondled her private parts with his hand, and that it was that report that the said certificate was designed to correct. The witness stated that County Attorney Greenwood first prepared a certificate similar to that in evidence, which concluded with the words: "and I hereby exonerate A. S. Bradford," which the witness refused to sign. He stated further that, in the presence of Mr. Greenwood and of County Judge Shepard, at the time he signed the above certificate, he stated that he intended, in the interest of peace, to deny the report that his daughter unbuttoned her drawers at the request of defendant, and that defendant then fondled her private parts with his hand, but that he did not intend to deny the charge made against defendant by his daughter.

B. B. Greenwood, county attorney of Stephens county, testified, for the State. that defendant came to him and told him that a report damaging to him, and reflecting upon his conduct toward one of Mr. Rives's daughters, was in circulation, and that he wanted witness to straighten it up for him. After conferring with J. H. Rives the witness prepared the certificate in evidence, which Rives signed, and enclosed it in a letter to defendant, asking him if it was satisfactory. Before writing the certificate in evidence the witness wrote a similar one concluding with the words: "and I hereby exonerate A. S. Bradford," which Rives peremptorily refused to sign.

Judge J. S. Shepard testified, for the State, that he was present when Rives signed the certificate in evidence, and heard Rives say that it was his purpose to deny in that certificate the report (and no other) that defendant induced the girl to unbutton her drawers, and that he, defendant, then fondled her privates.

*William Veale & Son,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. The charge in the indictment in this case was an aggravated assault committed by an adult male upon a female. Numerous objections are made to the charge of the court, and several exceptions were reserved to certain paragraphs of the same as well as the refusal to give special instructions requested for defendant.

To begin with the charge, it is quite voluminous and is not confined to the issue made by the indictment and proof, which was

solely the question of an assault by an adult male upon a female, but it gives in extenso almost the entire chapter of the Penal Code with reference to assaults and batteries, and the various circumstances which elevate them in degree to aggravated assaults, as well as the enumerated statutory cases in which the violence used would not amount to an assault. It is most clearly obnoxous to the objection that it is not limited to the case made; but it is not specially excepted to on this ground. The exceptions reserved relate to special portions, and we propose only to notice some of them.

In the closing paragraph, this language is used: "The jury are instructed to have due regard to a broken and violated law and the probability of inflicting an unjust punishment upon an innocent party." The first portion of this instruction is clearly erroneous in assuming that the law had been broken and violated, and is manifestly calculated to injure the rights of appellant.

Another instruction which was requested by defendant, but which was given with modifications by the court, is objected to because vague, misleading and contradictory. As shown in the bill of exceptions it is in these words: "Before you can find the defendant guilty as charged in the information, you must believe beyond a reasonable doubt that the acts done by the defendant at the time of the commission of the assault were the acts of preparation on the part of the defendant to have illicit, unlawful and improper connection; that is, that unlawful handling of the privates, or attempt to handle the privates, of the party alleged to be injured with the party assaulted." We are of opinion this instruction is vague, indefinite and uncertain, if not entirely meaningless in the latter clause.

Another special exception is reserved to the court's addition to the following instruction: "An aggravated assault and battery may be committed by any indecent handling or fondling of the person of a female by an adult male, without her consent and against her will;" which was a part of a special instruction asked by defendant, and to which the court added the words "submitted by the court, and the jury will please be governed thereby." We are of opinion the addenda of the court was improper, and calculated to impress the jury that in the court's opinion such a case had been made out against the defendant. The statute provides that when special instructions are requested "the court shall either give or refuse these charges with or without modification, and certify thereto, and when the court

shall modify a charge it shall be done in writing and in such manner as to clearly show what the modification is." (Code Crim. Proc., art. 679.) The addenda made by the court was not a modification, and in giving a charge without modification the court is only required to write upon it "given," or "given as requested," and then certify thereto by signing the same officially.

For the errors pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*